## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Lester B. Lynch, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | 1:21cv221 (AJT/IDD) |
| | ) | |
| Beth Cabell, | ) | |
|     Respondent. | ) | |

### <u>MEMORANDUM OPINION</u>

Lester B. Lynch ("Petitioner" or "Lynch"), a Virginia inmate proceeding <u>pro se</u>, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his January 5, 2004 convictions in the Circuit Court for the City of Norfolk, Virginia for first-degree murder, robbery, burglary and three counts of use of a firearm in the commission of those felonies. The Respondent filed a Rule 5 Answer and a Motion to Dismiss, with supporting briefs and exhibits, and Lynch has exercised his right to file responsive materials pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K) to the motion to dismiss. [Dkt. Nos. 18, 19, 21]. Lynch has also filed a motion to amend his petition and raise "a new claim" that he did not raise in state court and which he admits is "unexhausted" and "procedurally defaulted." [Dkt. No. 22 at 1-2]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the respondent's Motion to Dismiss must be granted and the petition will be dismissed with prejudice.

### I. Procedural History

#### A. Trial and Direct Appeal

On May 1, 2003, a jury in the Circuit Court for the City of Norfolk convicted Lynch of first-degree murder, robbery, burglary and three counts of the use of a firearm in the commission

of those felonies. By order dated January 4, 2004, the court sentenced Lynch to a total of 68 years in prison. Commonwealth v. Lynch, Case Nos. CR01-3449-12 through -17.[1]

The Court of Appeals of Virginia granted Lynch an appeal, and after briefing and argument affirmed his convictions. Lynch v. Commonwealth, 617 S.E.2d 399 (Va. App. 2005). Lynch had alleged that "the trial court erroneously admitted an out-of-court statement under the adoptive admission exception to the hearsay rule." Id. at 400. The Court summarized the evidence at trial as follows:

> On June 9, 2001, Belinda Scott was shot and killed inside her home by Lynch, "Tyreke" Williams, and a third, unidentified man. After the shooting, Lynch and Tyreke "burst" into a bedroom occupied by Belinda's son, Ronald, and his friend, Tamika Reid. The third man remained outside the bedroom door. Tyreke told Ronald to "get on his knees," pointed a gun at him, and told Tamika "not to move." Tyreke then repeatedly hit Ronald on the head with the gun and took some money out of Ronald's pockets, while Lynch removed heroin and money from a table in the room. The third man eventually told Tyreke and Lynch, "Let's get out of here." The three men then "ran out of the house."
>
> Earlier that afternoon, Kenneth Parker was "hanging out" at Tyreke's house with Christopher, Tyreke's brother. Kenneth saw Lynch drive up to the house in a black Acura. Tyreke was in the passenger seat. Lynch got out of the car to talk to Christopher, and Tyreke went across the street to get a gun. After he returned, Tyreke agreed to give Kenneth a ride home. Kenneth then got into the Acura with Lynch, Tyreke, and the unidentified third man. However, when Kenneth said that he needed to cross the Campostella Bridge, Lynch told him that they were going on a "sting," and they needed to "take care of [that] first." Thus, Kenneth got out of the car, and Lynch told him that they would return in about thirty minutes.
>
> When the three men returned to Tyreke's house, Kenneth noticed that Tyreke was wearing a different shirt and had small bloodstains on his clothing. Tyreke carried something into his house wrapped up in the shirt he had been wearing before the murder. Kenneth followed. After entering the house, Tyreke went directly to an upstairs bathroom, and Kenneth sat in the upstairs den. Lynch did not enter the house immediately, but remained in the driveway speaking to the third man, who was "looking down at the ground like something was really bothering him."
>
> When Tyreke left the bathroom, he knocked on Christopher's door and told him that "they had just shot a woman." Kenneth joined the conversation and asked

---

[1] Lynch's first two trials, in October 2002 and March 2003, ended in mistrials because the juries were unable to reach a unanimous verdict. [Dkt. No. 1-7 at 1]. References to the criminal record will be designated as follows: "CR at ___," and the trial transcripts as "TT Vol. ___ at ___."

Tyreke, "man, what you done got yourself into? You-all done shot a woman?" Tyreke responded, "yeah." Kenneth asked, "where was you-all at?" Tyreke responded, "we went to Little Ronald's house ... to go get him." Kenneth then asked, "why would you-all go in and try to do something and rob him or whatever when he cool with everybody?" Tyreke then said that he "don't care who I get" because "my light's due, my rent due, my girl getting ready to leave," and he was "going to get put out."

As Kenneth, Christopher, and Tyreke were discussing whether the "skinny lady" who had been shot was Ronald's mother or sister, Kenneth heard someone climbing the stairs. As Lynch reached the top of the stairs, he asked Tyreke "why he was telling [Kenneth and Christopher] what they had just done." Although Tyreke told Lynch that Kenneth was "cool" and would not tell anyone, Kenneth said he would have "nothing to do with it," and left the house. Kenneth called Ronald's cellular phone and spoke with Tamika, who was still hysterical over the events she had just witnessed.

Id. at 400-01. The Court of Appeals found that the Commonwealth had

presented sufficient evidence from which it could be inferred that Lynch overheard at least a portion of the conversation … the trial court could reasonably have inferred that Lynch understood not only the nature of the conversation, but also the fact that he had been implicated in the shooting. Specifically, Lynch entered the conversation and immediately asked, "Why you telling them what we just did?"…[and that] the trial court could reasonably have inferred that Lynch's statement, "Why you tell[] them what we just did?," was sufficient to indicate his agreement that he had been involved in the murder. Again, Lynch's use of the word "we" is telling. Rather than stating, "Why you tell[] them what you just did," Lynch asked, "Why you tell[] them what we just did?" Ordinarily, an individual accused of murder would take reasonable steps to deny his participation in that murder. Here, however, Lynch did not merely fail to deny his participation in the shooting — he, by his own words, affirmatively implicated himself. Thus, the trial court could reasonably have concluded that Lynch's statement was sufficient to indicate his agreement that he had been involved in the murder.

Id. at 404-05. The Supreme Court of Virginia granted Lynch an appeal on the same evidentiary issue, but affirmed his convictions. Lynch v. Commonwealth, 630 S.E.2d 482 (Va. 2006).

*B. First Habeas Petition*

On June 2, 2007, Lynch filed a habeas petition in the Circuit Court for the City of Norfolk, and raised the following claims:

A. The court erred in admitting into evidence the out of court statements of Kenneth Parker as adoptive admissions against the petitioner at trial.

3

    B.  The witnesses Tameka Reid and Ronald Scott were not credible as evidenced by their inconsistent testimony at trial.

    D.  Ineffective assistance of counsel.[2]

        1.  Counsel was ineffective because he did not introduce the petitioner's testimony at a previous hearing or otherwise inform the jury that the petitioner had previously testified that he did not go into the house, or go up the stairs, and never made the statement that he was accused of making.

        2.  Counsel's two-week delay in obtaining a videotape from a convenience store amounted to ineffective assistance of counsel because the tape would have established the petitioner's alibi.

    E.  The police conducted an inadequate investigation.

The circuit court dismissed the habeas petition on September 10, 2007. <u>Lynch v. Watson</u>, Case No. CL07-3485. Lynch did not appeal the dismissal to the Supreme Court of Virginia.

On January 18, 2017, Lynch filed a second habeas petition, by counsel, alleging violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), specifically, that the Commonwealth had failed to provide his defense the taped interviews of three witnesses. <u>Lynch v. Ray</u>, Case No. CL17-583 (hereinafter "CL17 at ___"). Lynch nonsuited his petition on June 6, 2017. (CL17 at 1982-83). On November 13, 2017, Lynch, by counsel, refiled a third petition for a writ of habeas corpus raising the following claim: "The Commonwealth violated petitioner's rights under the Fourteenth Amendment and Article 1, Section II of the Constitution of Virginia in failing to provide <u>Brady</u> evidence." (CL17 at 1974). Respondent moved to dismiss the habeas petition as time barred and without merit. The circuit court ordered an evidentiary hearing, which was held on August 2, 2018. On that date, the circuit court allowed petitioner to amend his pleadings to explain the specific allegations with respect to the allegedly non-disclosed taped statements made by the Commonwealth's witnesses Ronald Scott, Tamika Reid, and Kenneth Parker to the police.

On October 18, 2018, after considering the parties briefs, the circuit court found that

---

[2] Lynch skipped from the letter B to D, omitting the letter C, when he labeled his claims.

Lynch had failed to demonstrate the Commonwealth had suppressed exculpatory evidence and dismissed the petition. (CL17 at 887-88). Lynch, by counsel, appealed, and the Supreme Court of Virginia granted him an appeal. After briefing and argument, the Supreme Court of Virginia held, in an unpublished order dated February 13, 2020, that Lynch had failed to prove that the Commonwealth had suppressed exculpatory evidence. No petition for rehearing was filed.

Lynch, by counsel, filed a petition for certiorari in the United States Supreme Court arguing that (1) the Norfolk Circuit Court in state habeas erred in finding that he had failed to prove that the Commonwealth did not disclose exculpatory evidence; (2) the circuit court erred by deciding it was his burden under <u>Strickler v. Greene</u>, 527 U.S. 263 (1999), to prove the evidence had not been disclosed; and (3) the circuit court erred in not considering his post-hearing brief in support. The petition for certiorari was denied on October 5, 2020. <u>Lynch v. Cabell</u>, 141 S. Ct. 289 (2020).

## II. Lynch's Current Claims

On February 12, 2021, Lynch, proceeding <u>pro se</u>, filed a petition for writ of habeas corpus in this Court and raised two claims:

(1) The Commonwealth violated Lynch's rights under the 14th Amendment and article I, Section II of the Constitution in failing to provide <u>Brady</u> evidence.

(2) <u>Strickler v. Greene</u> should not be interpreted to require a petitioner for writ of habeas corpus to carry the burden that the evidence was suppressed.

## III. New Affidavits

Lynch responded to the motion to dismiss by filing a reply with exhibits [Dkt. Nos. 18, 18-1 through 18-10]; submitting additional affidavits on July 12, 2021 [Dkt. No. 19], to which respondent objected; and filing a "Supplemental Reply," dated August 27, 2021 seeing to add a new claim based upon the affidavits. [Dkt. No. 22]. Lynch admits his new claim involves the affidavits to which the respondent objected, and that the new claim is procedurally defaulted.

Lynch asserts the new claim should be considered because he has proved he is "actually innocent." The Supplemental Reply does not actually seek to add a new claim as much as it attempts to recast the existing claim (a <u>Brady</u> violation) by adding new evidence to "explain" trial counsel's testimony at the state evidentiary hearing in which he admitted he had received some "transcripts from the police department of … witness statements," but could not remember which witness statements and may have also received the alleged <u>Brady</u> material from another source. The state courts relied upon this testimony in finding that Lynch had failed to establish that the prosecution had suppressed the alleged <u>Brady</u> material.

The two affidavits at issue concern trial counsel, George Anderson ("Anderson"). The first affidavit is from Anderson's wife, Sarah Anderson. She attests that she located Lynch's file and the only transcripts of statements she found in the file were for Scott, Reid, and Parker and that the transcripts were accompanied by a May 3, 2018 letter from an attorney, Edward Fiorella.[3] [Dkt. No. 19-1]. Lynch argues that since the only statements Mrs. Anderson found in the file were the ones that accompanied the May 3, 2018 letter, that Anderson's "file did not, in fact, contain any evidence that the exculpatory evidence had been disclosed." [Dkt. No. 22 at 1-2]. Mrs. Anderson also avers that while her husband was diagnosed with dementia in 2020, he did not have any signs of dementia in 2017 when he signed the affidavit that was filed by Fiorella with the state habeas petition. She did aver, however, that Anderson sought medical attention for memory lapse and confusion in 2018.

The second affidavit, by Anderson's legal assistant, Jacqueline Switzer, indicates that she saw no indication in Lynch's file that Anderson had received the three transcripts prior to the

---

[3] The circuit court appointed Fiorella to represent Lynch and Fiorella represented him in the second and third state habeas proceedings, the appeal to the Supreme Court of Virginia, and the petition for certiorari to the United States Supreme Court.

ones that accompanied the May 3, 2018 letter. [Dkt. No. 19-2]. Switzer opines that, in her

opinion, "neither the recordings nor the transcriptions were ever produced to Mr. Anderson

during the course of his representation of Lester B. Lynch in these matters." [Id.].

First, it is irrelevant what was in Anderson's file for Lynch's case when examined by

either affiant. As respondent correctly points out, neither affidavit establishes whether or not

Anderson had "possessed or had seen the transcripts, had heard the recordings of these

statements, or had the impeaching/inconsistent information from another source, such as from

meeting with the prosecutor or discussions with the detective or from police summaries." [Dkt.

No. 20 at 3]. Respondent also details information from the allegedly undisclosed statements that

Anderson used at Lynch's trial, which Lynch alleges were not disclosed during discovery prior

to his third trial where he was convicted. [Id.] (citing Dkt. No. 13 at 24-25). Further, respondent

notes that, at the state habeas hearing, Anderson testified he was not positive that he had not had

the transcripts of the statements made to the police by Scott, Parker, and Reid. (Hab. T. at 53-

54).

Second, Anderson testified at the August 2, 2018 hearing in the state habeas proceedings

that he remembered that he had received some "transcripts from the police department of …

witness statements," but could not remember which witness statements. (Id. at 33). Anderson

also testified at the state habeas hearing that he could not testify that he had not "received the

information in those statements from another source." (Id. at 47). Mrs. Anderson does not aver

that he suffered any memory issues before the August 2, 2018 hearing. As pointed out at the

hearing, Anderson had access to the information in the statements and used it during the trial in

2002 when he cross-examined Scott. (Id. at 39-41). In short, Anderson apparently learned of

information in the three statements prior to Lynch's trial. Indeed, the affidavits are refuted by

Anderson's own testimony at the state habeas hearing that he had received transcripts of witness statements from the police.[4]

Third, the transcript of the state habeas hearing indicates the file had been turned over to state habeas counsel sometime prior to the August 2, 2018 hearing (Id. at 43), and that Anderson did not have the file when he prepared the affidavit he signed in July 2018. (Id. at 53-54). The two affidavits submitted by Lynch do not address where and how the file was maintained, who had access to it, what was in or not in the file when it was turned over to state habeas counsel, and does not indicate *when* either affiant reviewed the file. In short, there are serious issues of chain of custody concerning Anderson's file, which is the basis of Lynch's claim that the three transcripts were not disclosed. [Dkt. No. 22 at 1-2].

Lastly, Lynch's argument that the Court can now consider "new" evidence ignores the precedent respondent cites in her objections. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits federal habeas "review under § 2254(d)(1) … to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011); see Muhammad v. Clarke, 2012 U.S. Dist. LEXIS 10129, *24 (E.D. Va. Ja. 26,

---

[4] A September 27, 2001 letter from the prosecutor to Anderson, lists 21 specific items turned over to Anderson; that photographs of the crime scene are available for his inspection; and included a paragraph about witness statements.

> When the victim was interviewed the night the crime occurred, he initially identified two of the assailants as Gregory Williams (he knew him as Tyree" or "Tyreek") and his brother Christopher Williams (who he knew as "Christopher" or "Q"). He stated he got a good look at Gregory Williams, and assumed that his brother, Christopher, was also present. He also described a third assailant who was light-skinned. The victim was shown several photo lineups, and selected photographs of Gregory Williams and Lester Lynch out of those separate lineups.

[Dkt. No. 13-9 at 2]; (CR at 483). Two of the 21 items were 8 pages of notes from two investigators. The notes from Investigator Huffman, concerned the "photo identification of defendants by victim, oral statements made by co-defendant, and circumstances of [Lynch's] arrest." [Id. at 1]; (CR at 482).

Further, the materials disclosed by the trial prosecutor in October 2016 indicated that there were four taped interviews that had been destroyed. [Dkt. No. 18-3 at 9-13]. There is no evidence that any other taped interviews were made or transcribed in Lynch's case. Lynch has not disputed these facts and when taken together with Anderson's testimony, if recorded transcripts of witness statements (plural) were turned over to Anderson by the police (Hab. T. at 33), the transcripts of witness statements turned over to Anderson were likely that of either Reid, Parker, or Scott; or, at least, some combination of the three.

2012) (where a petitioner attempts to allege unexhausted facts, the federal court must defer to the state court's finding ) (citing Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002); Pinholster, 563 U.S. at 182-83), appeal dismissed, 474 F. App'x 979 (4th Cir. 2012).[5] Pinholster emphasized "that the record under review is limited to the record in existence at that same time — *i.e.*, the record before the state court." Id. (emphasis added). The Fourth Circuit found that the reasonableness of a state court decision is evaluated "'in light of the evidence presented in the State court proceeding.'" Porter v. Zook, 898 F.3d 408, 443 (4th Cir. 2018) (quoting Jones v. Clarke, 783 F.3d 987, 991 (4th Cir. 2015)).

Aside from the serious problems with the affidavits themselves, Lynch has known about the allegedly undisclosed statements since at least October 4, 2016. [Dkt. No. 13-6 at 6].[6] Lynch has also known about potential memory issues from at least the 2018 state habeas hearing[7] and was represented by counsel at that time and through October 5, 2020 when his petition for certiorari, which was filed by counsel, was denied. Nevertheless, Lynch waited nearly three years after the alleged memory issues arose before he sought to raise this version of his Brady claim.[8] The affidavits will not be considered with regard to Lynch's Brady violation (Claim I).

---

[5] Pinholster explained that

> [w]hat makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed. We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge.

563 U.S. at 183 n.3.

[6] Respondent argues that Lynch has admitted he knew of the statements since March 15, 2016. [Dkt. No. 1 at 6]. For purposes of this motion, the Court will use the October 4, 2016 admission.

[7] The Court does not find that Anderson had any memory issues in 2018. Anderson did answer he did not recall on numerous occasions during his testimony on August 2, 2018, he noted that it had been 15 years since the trial and the case had been tried three times, with the first two trials ending in mistrials. (Hab. T. at 27).

[8] While the Court will not consider the two affidavits with respect to the claims exhausted in state habeas, it will consider them with regard to Lynch's assertion of actual innocence. See Wolfe v. Johnson, 565 F.3d 140, 170 (4th Cir. 2009).

**IV. Statute of Limitations.**

A petition for a writ of habeas corpus must be dismissed if filed later than one year after (1) the judgment becomes final; (2) any state-created impediment to filing a petition is removed; (3) the United States Supreme Court recognizes the constitutional right asserted; or (4) the factual predicate of the claim could have been discovered with due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D). In calculating the one-year period, however, the Court must exclude the time during which properly filed state collateral proceedings pursued by petitioner were pending. See 28 U.S.C. § 2244(d)(2); Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005) (determining that the definition of "properly filed" state collateral proceedings, as required by § 2244(d)(2), is based on the applicable state law as interpreted by state courts).

Lynch's direct appeal became final on June 8, 2006, the date the Supreme Court of Virginia affirmed his convictions. The federal statute of limitations began to run on September 6, 2006 when the 90-day period during which Lynch could have filed a petition for a writ of certiorari expired. The federal statute of limitations under 2244(d)(1)(A) would therefore have expired on Thursday, September 6, 2007, one year and 90 days from the date of the Supreme Court of Virginia's opinion. See Harris v. Hutchinson, 209 F.3d 325, 328 n.1 (4th Cir. 2000) (AEDPA provides that the one-year period does not commence until the latest of the date when judgment on direct review "became final" or "the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A)).

The federal limitations period was tolled while Lynch's state habeas petition was pending from June 2, 2007 until September 10, 2007. On June 2, 2007, 269 of the 365 days had elapsed, which left Lynch with 96 days remaining in the limitations period. Allowing for the 30 days in which Lynch could have appealed the September 10, 2007 dismissal, Lynch had to file his federal habeas petition by Monday, January 14, 2008. He did not file the instant petition until

February 12, 2021.[9] Whether Lynch is proceeding based upon the theory of equitable tolling or

that an alleged state impediment prohibited him from discovering the Brady claim, 28 U.S.C. §

2244(d)(1)(B), Lynch's federal habeas is untimely.

### A. Post-Conviction Proceedings in 2016-18

Lynch filed a motion for storage and preservation of evidence on March 15, 2016, and

Fiorella was appointed to represent him. [Dkt. No. 13-6 at 6].[10] Lynch conceded in his state

habeas petition that the prosecution disclosed the alleged Brady material on or about October 4,

2016 when the prosecutor filed her response to his motion and forwarded that response to

Fiorella. Accordingly, any alleged state impediment to his discovery of the alleged Brady

material was removed as of that date, which meant Lynch had to file his federal habeas petition

by Thursday, October 4, 2017.[11] Lynch filed his second state petition, which included his current

two claims, on January 18, 2017. From October 4, 2016 to January 18, 2017, a total of 106 of the

---

[9] The federal petition was "hand delivered" to the Clerk and stamped received on February 25, 2021. Lynch did not rely on the prison authorities to send his federal petition. See Wilder v. Chairman of the Cent. Classification Bd., 926 F.2d 367, 370 (4th Cir. 1991) (finding Houston v. Lack, 487 U.S. 266, 276 (1988) filing rule does not apply when a prisoner gives papers to a person other than the prison authorities); see also Dison v. Whitley, 20 F.3d 185, 187 (5th Cir. 1994) (holding Houston exception is limited to filings with prison officials, over whom a prisoner has no control). Lynch has provided an affidavit indicating the petition was hand delivered to the Norfolk Division of this Court on February 12, 2021, and the Court will use that date in determining the current motion to dismiss.

[10] The petition for a writ of certiorari filed by his post-conviction counsel, Fiorella, states Lynch learned about the existence of the alleged Brady material on October 4, 2016. [Dkt. No. 1-5 at 15].

[11] Lynch has included the October 4, 2016 response of the prosecutor to his motion for storage and preservation of evidence, which indicates that the circuit court appointed Fiorella to represent Lynch on June 13, 2016 [Dkt. No. 18-3 at 2]. The Virginia Case Information website, see http://ewsocis1.courts.state.va.us/CJISWeb/Search.do, for the Norfolk Circuit Court Virginia, Case No. CR16-686-00 (search Lynch, Lester) (last viewed Jan. 31, 2022), corroborates the appointment. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) ("most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (collecting cases); see, e.g., Lynch v. Leis, 382 F.3d 642, 647 & n.5 (6th Cir. 2004) (taking judicial notice of state court records available to public online). The certificate of service indicates the pleading was sent to Fiorella. The attachments to the response indicate four cassette tapes had been destroyed. The online docket indicates there was an in-court hearing on October 25, 2016 in which the matter was "resolved." In a letter/motion dated February 1, 2017, Lynch acknowledges being present at the October 25, 2016 hearing and that Fiorella would "explore" filing for relief from Lynch's convictions. (CL17 at 307). In a subsequent letter dated February 16, 2016, Lynch states Fiorella "discovered" the "violations" that were included in the habeas petition. (Id. at 313).

365 days elapsed.[12] On June 6, 2017, the circuit court entered a non-suit.[13] Lynch, by counsel, filed a third state habeas petition on November 13, 2017. The third state habeas was dismissed on October 18, 2018, and the Supreme Court of Virginia dismissed Lynch's subsequent appeal on February 13, 2020.[14] Lynch avers through an affidavit from Candace J. James, his post-conviction counsel's legal assistant, that his current federal petition was hand-delivered to the federal courthouse in Norfolk, Virginia on February 12, 2021, but was apparently not stamped filed until February 25, 2021. [Dkt. Nos. 6 at 2; 6-5 at 1].

Assuming that the current federal petition was filed on February 12, 2021, the petition is still untimely. As noted 106 days elapsed between the time the alleged impediment was removed and the date he filed the second state habeas petition. Lynch's argument that the time should run from May 1, 2018 ignores his own concession and admission in state habeas that he learned

---

[12] Fiorella prepared the habeas petition and forwarded, with Lynch's signature, to the circuit court under a cover letter dated December 30, 2016. (CL17 at 257). A second cover letter dated January 16, 2017 from Fiorella to the clerk included Lynch's in forma pauperis ("IFP") application. (Id. at 258). The December 30, 2016 correspondence and habeas petition indicate that Lynch was aware of the claims before December 30, 2016. In Virginia, a habeas petition is not considered pending during the time between December 30, 2016 and January 16, 2017 when the IFP application was submitted because Lynch had not followed the proper state procedures. Virginia Code § 8.01-655 provides that the clerk shall not file a habeas petition "without payment of court costs unless the petitioner is entitled to proceed in forma pauperis *and* has executed the affidavit in forma pauperis." (emphasis added). In Lahey v. Johnson, 720 S.E.2d 53 (Va. 2012), a s scenario similar to the sequence of events in Lynch's case occurred. In Lahey, the petitioner's counsel submitted a petition on December 29, 2008, the last day upon which to file, but failed to include an IFP and the filing fee was not submitted until January 5, 2009. Lahey held that failure to comply with the plain language of § 8.01-655 meant that the petition was not deemed filed until January 5, 2009, which was after the statute of limitations had lapsed and the court found the petition was barred by the statute of limitations.

[13] Lynch argues that during the six-month nonsuit period, which tolls the state statute of limitations, that the federal statute of limitations was also tolled. The Court need not resolve this issue, but observes that during that six-month period between the non-suit of the second state habeas and his filing of the third petition that there was nothing pending review in state court. See Lawrence v. Florida, 549 U.S. 327, 332 (2007) ("The application for state postconviction review is therefore not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari.").

[14] A petitioner is not entitled to statutory tolling for the period available to file a petition for writ of certiorari to the United States Supreme Court following state collateral review, even if a petition for certiorari is filed, because the Supreme Court "is not a part of a state's post-conviction procedures." Lawrence v. Florida, 549 U.S. 327, 332 (2007) ("The application for state postconviction review is therefore not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari.").

about the alleged statements on October 4, 2016. [15] Nothing attributable to the Commonwealth prevented him from filing after that date. See Wood v. Spencer, 487 F.3d 1, 7 (1st Cir. 2007) ("[A] state-created impediment must, to animate the limitations-extending exception [of § 2244(d)(1)(B)], 'prevent' a prisoner from filing for federal habeas relief."); Lloyd v. Vannatta, 296 F.3d 630, 633 (7th Cir. 2002) ("the plain language of the statute makes clear that whatever constitutes an impediment must prevent a prisoner from filing his petition"); see also Ramirez v. Yates, 571 F.3d 993, 1001 (9th Cir. 2009) (a court should not grant a habeas petitioner a new limitations period due to a state created impediment unless the petitioner establishes he was "prevented ... from presenting his claims in any form, to any court."). [16] Lynch is not entitled to statutory tolling other than the 106 days that he has been credited with herein and his § 2254 petition is therefore untimely unless he is entitled to equitable tolling.

   *B. Equitable Tolling*

   An untimely federal habeas petition can be considered by a federal court if the petitioner can establish he is entitled to equitable tolling, which requires that the petitioner show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. See Holland v. Florida, 560 U.S. 631, 649 (2010) (citation omitted). A petitioner asserting equitable tolling "bears a strong burden to show specific facts" that demonstrate fulfillment of both elements of the test, Yang v. Archuleta, 525 F.3d 925, 928 (10th Cir. 2008) (quoting Brown v. Barrow, 512 F.3d 12304, 1307 (11th Cir. 2008)), and generally is obliged to specify the steps he took in diligently pursuing his federal claim. Spencer

---

[15] The date May 1, 2018 is apparently the date physical copies of the transcripts of the three witness statements were provided to state habeas counsel. [Dkt. No. 1-5 at 16] (CL17 at 1736). Although the actual transcripts were relevant, Lynch did not need the actual witness statements to file his state petition, which is established by the fact that the second state habeas petition was drafted prior to December 30, 2016, and filed on January 18, 2017.

[16] As noted earlier, Lynch knew about the alleged Brady material prior to December 30, 2016. See, supra note 12. Even if the December 30, 2016 date is used, instead of October 4, 2016, the number of days that elapsed is reduced from 106 to 21 days and the present petition is still untimely.

v. Sutton, 239 F.3d 626, 630 (4th Cir. 2001). In addition, Lynch must "demonstrate a causal relationship between the extraordinary circumstance on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the circumstances." Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000). It is widely recognized that equitable tolling is to be applied only infrequently. Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (resort to equity is "reserved for those rare instances where - due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice would result.").

The circuit court dismissed his third state habeas petition on October 18, 2018. Lynch has not explained why he could not have filed a federal petition at that point and asked the federal court to stay and abey the federal proceedings until he finished exhausting his state claims via his counsel's appeal of the dismissal to the Supreme Court of Virginia.[17] Likewise, after the dismissal of the appeal on February 13, 2020, Lynch could have pursued a federal habeas petition while his counsel prepared and filed his petition for a writ of certiorari.[18] Lynch did not act in a diligent manner in pursuing federal relief.

---

[17] The Supreme Court has expressly sanctioned filing a federal petition and seeking a stay from the district court to allow for exhaustion in state court where the state petition could result in a dismissal as untimely, which would negate tolling while the state proceedings were pending. The Supreme Court held "[a] prisoner seeking state postconviction relief might avoid this predicament ... by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005) (citing Rhines v. Weber, 544 U.S. 269, 278 (2005)); see, e.g., Freeman v. Page, 208 F.3d 572, 577 (7th Cir. 2000) ("a prisoner who wants to pursue state relief while assuring an entitlement to federal relief can protect himself by filing in both courts. The federal action should be stayed while the state court decides what to do.").

[18] Lynch alleges he was assaulted by another inmate on February 4, 2021 and had to mail his federal petition to his post-conviction counsel to be hand-delivered to the federal court. The alleged excuse ignores the federal statute of limitations had already lapsed prior to February 4, 2021 because Lynch's calculations do not include his own admission that he became aware of the basis of his claim on October 4, 2016.

Moreover, equitable tolling is also foreclosed by the results of the state habeas proceedings. It is apparent from those proceedings that the substance of the statements was disclosed to Anderson, Lynch's trial counsel, because Anderson used information from the statements in his examination of witnesses, and Anderson admitted at the hearing that he had been provided with some witness transcripts, but he could not remember which ones. See, supra at 7-9. Lynch's argument for equitable tolling for his alleged "Brady" claims fails because he failed to establish the prosecutor did not disclose the statements or the exculpatory impeachment evidence therein, and he has failed to exercise diligence in filing his federal petition once he "became aware" of the statements on October 4, 2016. [Dkt. Nos. 1-6 at 2; 1-7 at 5]. See Pace, 544 U.S. at 418.[19]

Lastly, Lynch has not established an actual innocence gateway to avoid the time bar. His "Brady" arguments, at best, relate to prior inconsistent impeachment evidence of the Commonwealth's witnesses, and are not new evidence demonstrating his actual innocence. McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar [or] expiration of the statute of limitations."). See also Schlup v. Delo, 513 U.S. 298, 327-32 (1995) (discussing requirements for showing of actual innocence to excuse procedural default in federal

---

[19] In reviewing the records from the circuit court proceedings, Lynch and his trial counsel were made aware *before his first trial* of the existence of a taped statement Reid made to police. During the February 21, 2002 motion to suppress, the prosecutor asked Detective Huffman if he had taken "a detailed, taped statement from" Reid when he interviewed her on June 16, 2001, and Huffman responded, "That's correct." (2/21/02 Tr. at 56). On cross-examination, trial counsel Anderson established that the interview lasted about one hour. (Id. at 66). During the October 2-7, 2002 trial, which ended in a mistrial, Anderson had a copy of the motion to suppress transcript with him during trial and used it in his cross-examination of Reid, as well as Huffman. (Tr. at 156-57, 175, 180-81, 234). Anderson also had copies of the transcripts from the trial of co-defendant Gregory Williams and used those in his cross-examination of Reid. (Id. at 158-59). Anderson used the October trial transcripts (and others) in his cross-examination of Scott, Parker, and Reid at the March 2003 trial. (Tr. at 41-42, 50, 51-52. 172-73, 221-22, 223, 225, 227). During the March 2003 trial Huffman testified that he took a detailed statement from Scott on June 9, 2001. (Id. at 240).

habeas). However, evidence that is merely impeaching, rather than exonerating, does not constitute "new reliable evidence" under Schlup and McQuiggin. See Calderon v. Thompson, 523 U.S. 538, 562-63 (1998); Sawyer v. Whitley, 505 U.S. 333, 349 (1992) (newly discovered impeachment evidence "will seldom, if ever," establish actual innocence); Wadlington v. United States, 428 F.3d 779, 784 (8th Cir. 2005) (rejecting the petitioner's claim that an affidavit constituted "new reliable evidence" where the affidavit was "at best, impeachment evidence and [did] not exonerate" the petitioner).[20]

In addition, evidence is "not 'new [when] it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." Moore v. Quarterman, 534 F.3d 454, 465 (5th Cir. 2008). Here, the trial record indicates that some of the allegedly withheld evidence was used by or known to trial counsel and that trial counsel was aware that police in Norfolk often recorded witnesses' statements. See, infra at 7-8. See United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) ("where exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine."). To be sure, during the motion to suppress on February 21, 2002, Detective Huffman confirmed that he had taken "a detailed, *taped statement* from" Reid when he interviewed her on June 16, 2001 (2/21/02 Tr. at 56) (emphasis added), and in a subsequent proceeding testified that he had taken a detailed *statement* from Scott on June 9, 2001. (3/19/03 Tr. at 240) (emphasis added). Trial counsel was also aware that the Norfolk police often recorded witness statements, he knew before trial that at least one of the three

---

[20] In addition, "'to be credible,' a claim of actual innocence must be based on reliable evidence *not presented at trial*." Calderon, 523 U.S. at 559 (quoting Schlup, 513 U.S. at 324) (emphasis added). As noted herein, see infra at 7-8, information from the statements allegedly not provided to trial counsel was actually used or known by trial counsel. Consequently, the actual innocence claim is predicated on *additional* impeachment evidence to that actually used at trial. See, infra at note 22 (noting instances of impeachment at trial).

witnesses (Reid) had given a statement that had been recorded, and knew that the victim (Scott) had also made a detailed statement to police prior to trial as well. It is further evident from Lynch's trial that Anderson knew Parker had initially told police he did not know anything before changing his story and impeached Parker at Lynch's trial when he denied knowing anything about the crimes. (TT Vol. II at 44-46).[21]

Based upon the trial record, the post-conviction proceedings in state court, and his recent affidavits, Lynch is not entitled to equitable tolling of the statute of limitations. Lynch's claims are barred by the statute of limitations. In addition, as discussed herein, the Brady claim also has no merit.

## V. Exhaustion

Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court. See 28 U.S.C. § 2254(b); Granberry v. Greer, 481 U.S. 129 (1987). To comply with the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, a petitioner convicted in Virginia must have presented the Supreme Court of Virginia with the same factual and legal claims raised in his § 2254 petition. See, e.g., Duncan v. Henry, 513 U.S. 364, 365-66 (1995); Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002). The exhaustion requirement is satisfied by a finding that the "essential legal theories and factual allegations advanced in federal court ... [are] the same as those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993) (citing Picard v. Connor, 404 U. S. 270, 275-76 (1971)).

---

[21] Trial counsel knew at the second trial that ended in a mistrial that Parker had lied to the police when he was first questioned. (3/19/03 Tr. at 181-82).

To satisfy the exhaustion requirement, a petitioner "must have presented to the state court 'both the operative facts and the controlling legal principles.'" Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002) (citation omitted). process." See, supra at 8-9 (discussing Pinholster). Respondent admits that Lynch exhausted his state remedies with respect to the two claims he raised in his federal petition because each was presented to the Supreme Court of Virginia on his appeal of the denial of habeas relief by the circuit court, to the extent he is relying on the same operative facts and controlling legal principles he raised and relied upon in the state proceeding. See Burket v. Angelone, 208 F.3d 172, 183 n.11 (4th Cir. 2000). Further, a petitioner must have presented "both the operative facts and the controlling legal principles' to the state court for review"). Respondent admits, to the extent Lynch raised his claims and the facts in support of them in the Supreme Court of Virginia, the present claims are exhausted. [Dkt. No. 13 at 11].

## VI. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, 556 U.S. 111, 121 (2009). "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 20 (2013).

An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Renico v. Lett, 559 U.S. 766, 772-73 (2010). That is, the state court's judgment "must be objectively unreasonable,

not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (internal quotations and citation omitted); see Harrington v. Richter, 562 U.S. 86, 103 (2011) (state decision is unreasonable application of federal law only if ruling so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair[-]minded disagreement").

This "highly deferential standard ... demands that state court decisions be given the benefit of the doubt." Renico, 559 U.S. at 773 (internal quotations and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." Lenz v. Washington, 444 F.3d 295, 299 (4th Cir. 2006); see, e.g., Nicolas v. AG of Md., 820 F.3d 124, 129-130 (4th Cir. 2016) ( reviewing a Brady claim "through AEDPA's deferential lens"). "[A] determination on a factual issue made by a State court shall be presumed correct." Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." Green v. Johnson, 515 F.3d 290, 299 (4th Cir. 2008). See Schriro, 550 U.S. at 473-74.

*A. Evidence at Trial*

On June 9, 2001, Tamika Reid visited Ronald Scott ("Scott") and his mother Belinda Scott's ("Belinda") at their house on Lens Avenue in Norfolk. (TT. Vol. I at 65, 78). At one point, Belinda complained to Scott about some people sitting in a car near the house, but Scott was not worried because he recognized one of them as an acquaintance, Gregory "Tyreke" Williams. (Id. at 78). Tyreke was sitting in an Acura or Honda with two men whom Scott did not know. (Id. at 78-79). In court, Scott identified one of them men as Lynch. (Id.). Later that

evening, Scott was awakened by Reid and his mother calling his name. (Id. at 80-82). Moments

later, two men burst into the bedroom where he and Reid were sleeping. (Id.). At trial, Scott

testified that one of the men was Tyreke and the other was Lynch. (Id.). The men began to beat

Scott on the head. (Id.). Tyreke struck Scott on the head with a gun several times and took

money from his pockets, while Lynch took narcotics and money from a table. (Id. at 82-83). A

third man whom Scott could not identify remained outside the bedroom. (Id. at 93).

Reid testified that around 9:30 p.m., Scott's mother called though the bedroom door to

tell Scott that someone named "Do Wop" wanted him. (TT. Vol. II at 60-61). After two men

kicked down the bedroom door, Reid saw the men hit Scott on the head. (Id.). One of the men hit

Scott on the head with a gun while the other paced and "tore up" the room. (Id.). At trial and to

police from a photo lineup, Reid identified Lynch as one of the assailants. (Id. at 69).

After the men left the house, Scott left the room and found his mother (Belinda Scott),

unconscious near the front door with blood under her eye. (TT. Vol. I at 90). The paramedics

arrived at 9:48 p.m. and discovered Belinda on the floor near the door of her apartment. She had

sustained a gunshot wound to the face and died from her injuries. (Id. at 155).

Robert Lee Revell, who lived across the street, arrived home and noticed three men

standing between Belinda's home and a neighboring home; Revell thought that was unusual so

he watched the men walk away from the residence. (Id. at 174). A few minutes later Reid came

to Revell's door and asked him to call paramedics because a woman had been shot. (Id. at 178).

Revell could not identify Lynch as one of the three men he had seen. (Id. at 179).

Kenneth Parker testified that he knew Belinda, Scott, and Gregory "Tyreke" Williams.

(TT. Vol. II at 6-7). On June 9, 2001, Parker was with Christopher Williams, Tyreke's brother, at

Christopher's house on West 27th Street in Norfolk. (Id.). Lynch drove up in a dark brown Acura

20

Legend, Tyreke was in the passenger seat; and a "young fella" Parker did not know was in the backseat. (Id.). Tyreke tucked a black object under his shirt and into his waistband as he got out Lynch's car. (Id. at 10-11).

Parker asked Tyreke for a ride and got into Lynch's car with Lynch, Tyreke, and the "young fellow" in the back seat. (Id.). Lynch told him that they had something to "take care of first." (Id. at 6-7). As Parker got out of the car, Tyreke told him that they would give him a ride when they returned. (Id. at 11-12). When the three men returned 30 to 45 minutes later, Parker noticed that Tyreke was wearing a different shirt and had small blood stains on his clothes. (Id. at 15, 27). Tyreke carried something wrapped in his shirt into Christopher's house, and Parker followed. (Id. at 16-17). The "young fellow" and Lynch were standing by the car when Tyreke and Parker entered the house. (Id.). Tyreke went directly to an upstairs bathroom and Parker sat in the upstairs den. (Id. at 17).

Tyreke told Christopher that they had just "shot a woman at Little Ronald's" [Scott's] house, and that the "young boy" was "trigger happy." (Id. at 17-18, 52). Those statements caught Parker's attention and he joined their conversation. (Id.). As Parker, Christopher and Tyreke discussed whether the "skinny lady" who had just been shot was Scott's mother, Parker said, "What difference does it make if it's his sister or his mom? You all just killed somebody." (Id. at 18). Lynch climbed the stairs and asked Tyreke "why he was telling [Christopher and Parker] what they had just done." (Id. at 18, 54).

The parties stipulated at trial that police "made contact with an Acura (the same car identified by Parker at trial) when Lynch turned himself in at the Police Operations Center." (TT Vol. I at 198).

Detective Huffman testified at trial that Scott initially told him that there were possibly "four black males" who came into Belinda's apartment the night of the shooting. (TT Vol. II at 97). Huffman testified that Scott recognized some of them by nickname and the fourth man by description. (Id.). Scott told Huffman some of the men struck him with a pistol. (Id.). Huffman then testified that Scott changed his statement the next day and testified that Scott definitely saw "Tyreke," but merely assumed that Christopher Williams and Kenneth Parker were also there. (Id.). Scott also changed his statement to say that there were three, not four individuals, and described one of them as a light skinned or red skinned male, and another as a younger darker skinned male whom he did not know. (Id. at 99). Huffman prepared a photo line-up which included Lynch's photograph, and Scott identified Lynch as one of the perpetrators. (Id. at 101).

The defense presented evidence from Kimberly Palmer (Lynch's cousin) and Tyreke's girlfriend, who testified that she saw Tyreke and Lynch together on the evening of the murder around 5:00 p.m. (Id. at 111-12). She spoke to Lynch on the phone between 8:30 and 9:00 p.m., and that he was at "Morris's house" in Virginia Beach "where they all hang out at." (Id. at 114).

Lynch's mother testified that he called her repeatedly on the night of the murder asking for money. (Id. at 132). Finally, Latanya Palmer testified that Lynch arrived at "Morris's house" after 8:00 p.m. and was there for a "little bit." (Id. at 134). She did not see Lynch leave, but she did see him go upstairs and look for "Morris." (Id.).

*B. State Habeas Hearing*

Attorney George Anderson represented Lynch at the trial in which Lynch was convicted and at two previous trials that ended in mistrials. He prepared an affidavit alleging that he had not received the recorded statements to police of Scott, Reid and Parker made to Huffman (Hab. T. at 28, 31, 33), and testified he would have used that information at trial. (Id. at 24). Anderson

also testified that he did not remember the names of the witnesses at the trials, that he had in fact received transcripts of recorded police statements of some witnesses at trial, and that he did not recall the names of the witnesses that corresponded to the transcripts he had received. (Id. at 28, 31, 33). Anderson also did not recall whether he was aware that Scott had changed his story to police prior to trial (Id. at 40), filing a motion to suppress (Id. at 36), or whether he had received information that one of the assailants was light skinned or red skinned. (Id.). He could not recall whether he had learned of the information in the transcribed statements from a source other than the transcribed statements. (Id. at 46, 47).

With regard to Reid, Scott, and Parker, Anderson testified that he did not recall receiving transcripts of their police statements from the Commonwealth, but he could not be sure that he did not receive them; and despite these facts, he admitted that he had nonetheless sworn earlier to an affidavit saying that he had not received them. (Id. at 53). Anderson acknowledged that he had not been able to locate his file prior to preparing the affidavit to determine whether he had copies of the transcribed police statements. (Id. at 54).

A copy of the Commonwealth's September 27, 2001, discovery letter was filed in the trial court's criminal file, which stated, in part, that

> [w]hen the victim [Ronald Scott] was interviewed the night the crime occurred, he initially identified two of the assailants as Gregory Williams (he knew him as "Tyree" or "Tyreek") and his brother Christopher Williams (who he knew as "Christopher" or "Q"). He stated he got a good look at Gregory Williams, and assumed his brother, Christopher, was also present. It was later proven that Christopher Williams could not have been present. He also described a third assailant who was light skinned. The victim was shown several photo lineups and selected photographs of Gregory Williams and Lester Lynch out of those lineups. (Exhibit I, discovery letter introduced at evidentiary hearing in state habeas).

Copies of the police transcripts of the interviews of Tamika Reid, Ronald Scott and Kenneth Parker were introduced at the state habeas evidentiary hearing as exhibits.

*C. Claim (1)*

Lynch alleges in his federal petition that the Commonwealth failed to disclose <u>Brady</u>

material at trial. His claim must be dismissed because the state habeas court's findings in this

regard were not contrary to or based on an unreasonable application of established federal law or

based on an unreasonable interpretation of the facts.

A state court's decision may be overturned on factual grounds only if its determinations

of fact are "objectively unreasonable in the light of the evidence presented in the state-court

proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). State court decisions about witness

credibility are factual determinations entitled to a presumption of correctness. <u>Id.</u> at 324.

The state habeas court held an evidentiary hearing on Lynch's claim that the

Commonwealth had failed to disclose the taped police interviews of witnesses Reid, Parker and

Scott. The state habeas court found that Lynch had failed to carry his burden to show that the

Commonwealth failed to disclose the recorded interviews or the impeachment information

therein. The state court heard Anderson testify, and credited those portions of his testimony

where he admitted to receiving transcripts of witness statements from police and that he could

not testify that the transcripts provided by the police were not transcripts of Reid, Parker, or

Scott's statements. In affirming the dismissal of Lynch's <u>Brady</u> claim, the Supreme Court of

Virginia held

> The evidence provided during the evidentiary hearing only showed that the
> recordings and or statements were not included in a discovery letter specifically
> during trial. The evidence did not support Lynch's argument that the
> Commonwealth suppressed the statements from Anderson and Lynch. Anderson
> could not recall any specific information from Lynch's criminal trial yet testified
> that he must not have received the statements from Reid, Scott and Parker because
> he did not use them during cross-examination. He stated in an affidavit that he
> [had] reviewed his entire file from Lynch's trial yet testified during an evidentiary
> hearing that he was unable to locate the file. As the circuit court found ,
> Anderson, under oath, testified that he did receive transcripts of recorded

24

statements of some witnesses at trial but he could not locate his file prior to preparing the affidavit to determine whether he had copies of the transcribed statement of the witnesses in question," the court further stated Anderson "did not recall receiving the police statements from the Commonwealth, but he could not be sure he did NOT receive them." Finally, the court found "Anderson []repeatedly stated he could not recall whether or not he [had] received the statements of Tamika Reid, Ronald Scott and Kenneth Parker.

[Dkt. No. 1-7 at 5].

Lynch has failed to rebut the presumption that the state habeas findings of fact were correct by clear and convincing evidence, which is his burden under the AEDPA. See Weeks v. Angelone, 4 F. Supp. 497, 523 (1998); 28 U.S.C. § 2254(e)(1); see also Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010) ("Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."); see generally Correll v. Thompson, 63 F.3d 1279, 1293 n.11 (4th Cir. 1995) (holding that when independent review of the record demonstrates that factual findings of a state court are supported, the § 2254(d) presumption of correctness attaches even if the state court adopted verbatim the state's proposed findings of fact).

Lynch also ignores the related caselaw that holds that Lynch cannot establish a Brady violation if the material was available at trial or from another source. United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990). See also Stockton v. Murray, 41 F.3d 920, 927 (4th Cir. 1994) (holding "Brady does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense"). The trial record and the state habeas hearing establish that trial counsel, Anderson, had to have access to the information in the allegedly non-disclosed witness statements.

At the habeas hearing, Anderson testified that he received transcripts of recorded statements of some witnesses at trial, but he could not locate his file prior to preparing the

affidavit to determine whether he had copies of the transcribed police statements of the witnesses in question; and that he could not be sure he did not receive them.

The trial transcripts clearly show that Anderson had much more detail about Scott's first statement to police than had been provided by the Commonwealth in that original discovery letter. In his opening statement at trial, despite the fact that it was not part of the information provided in the prosecutor's discovery letter, Anderson stated: "When [Scott] first spoke to the policemen, he said there were four people present. He didn't know, but he said there were four." (TT. Vol. I at 51). This is consistent with Scott's first recorded statement to police that there were four intruders, but not all of them came into the room. [Dkt. No. 13-10 at 3]. Anderson told the jury, "Mr. Scott, when he talked with police that night, gave the name of Christopher Williams, known as Quail or Q who is the brother of Gregory Williams." (TT Vol. I at 5). Anderson also told the jury, "Mr. Scott also gave the name of KP [Parker] as being one of the people he thought was there." (Id. 54). Parker was not mentioned in the discovery response, yet counsel knew that information was in Scott's statement to police prior to trial. [Dkt. No. 13-10 at 7, 14]. Anderson impeached Scott on this point during cross-examination, as well as that Scott had given the police two statements and Scott had to give a second statement retracting his first statement and "clear[] up" what happened. (TT Vol. I at 130-31).

Lynch is also incorrect that Scott told police in his first statement that Parker was one of the individuals who had entered his room that night. [Dkt. No. 1-2]. Scott actually said that Parker was standing in the background and he recognized his voice. [Dkt. No. 13-10 at 7]. That exact information was presented at trial during trial counsel Anderson's cross-examination of Detective Huffman when he asked Huffman, "At what point did KP become a suspect to you?" (TT. Vol I 54). Huffman responded, "When we first spoke with Ronald Scott that first night and

26

he stated KP—he thought he saw KP lingering in the background." (Id.). Although Anderson did not use the transcript to impeach Scott, he asked Huffman, "He also thought it was because of some mannerisms and a voice, he thought it was KP there." (Id.). Huffman replied, "That is what he said, yes." (Id.). Thus, Anderson was aware of specific information from the statements far beyond that which was disclosed in the September 2001 discovery letter, and he had the opportunity to introduce those inconsistent statements through the testimony of Detective Huffman at trial.

Lynch argues that Scott's statements to police were inconsistent because he described Lynch as "red skinned" in his statement to police. [Dkt. No. 1-4 at 11, 30). At trial, Scott testified that he identified Lynch as the perpetrator and testified that he was "light skinned." (TT. Vol. I at 41). However, Detective Huffman testified at trial that Scott had previously described the assailant as a "reddish skinned black male." (TT. Vol. I at 54). Thus, to the extent that there is a difference between the description of a "red skinned guy" and a "light skinned guy," the defense had this information at the time of trial, used it, and was free to argue that to the jury.

The state court's decision in dismissing this claim was not contrary to or involved an unreasonable application of clearly established federal law, nor was the decision based on an unreasonable determination of the evidence presented in the state court. See 28 U.S. Code § 2254(d). Claim 1 will be dismissed.

*D. Claim (2)*

In Claim (2) Lynch argues that he should not be required to carry the burden to establishthat the alleged Brady evidence was suppressed. The state habeas court correctly held that it was his burden to establish a Brady violation [Dkt. No. 1-7 at 4], and that decision was not contrary to established federal law. Skinner v. Switzer, 562 U.S. 521, 536 (2011).

"There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler</u>, 527 U.S. at 281-82.[22] Contrary to Lynch's argument, the United States Supreme Court made it clear in <u>Strickler</u> that it is the petitioner who "must convince [the Court] that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." 527 U.S. at 289 ("Petitioner has satisfied two of the three components of a constitutional violation under <u>Brady</u>.").[23]

The state court's decision in dismissing this claim was not contrary to or involved an unreasonable application of clearly established federal law, nor was the decision based on an unreasonable determination of the evidence presented in the state court. See 28 U.S. Code § 2254(d). Claim 2 will be dismissed.

---

[22] Absent from Lynch's discussion is any acknowledgement that his attorney impeached Reid, Scott, and Parker at trial. Anderson pointed out Scott changed his testimony on points from the prior mistrials and was inconsistent in his answers (Vol. I at 98, 102, 107, 110-14, 127-28, 136-37, 148). Anderson pointed out that Parker had testified inconsistently at Lynch's trial with what he had testified to previously. (Vol. II 24-26, 35-36, 44-45, 50). Anderson also impeached Reid by pointing out she did not recall her testimony on points from the prior trials. (<u>Id.</u> 79-80, 81-84, 84-85). In response to a question about her testimony changing, Reid testified she had "probably misunderstood the questions." (<u>Id.</u> 87). Although brought out by the prosecutor, all three had prior criminal convictions. Reid had been convicted of misdemeanor larceny twice and a felony burglary charge. (<u>Id.</u> 69). Parker had been convicted of misdemeanor receipt of stolen property and petty larceny, as well as felony receiving stolen goods, three burglaries, and a recent possession of a controlled substance. (<u>Id.</u> 21). Scott had five prior felony convictions for drug possession, possession with intent to distribute, distribution of heroin, and shooting into a vehicle. (Vol. I 94).

[23] The Fourth Circuit has consistently held that it is the petitioner's burden to establish a <u>Brady</u> claim. See <u>Porter</u>, 898 F.3d at 438 ("The burden of proof [of a <u>Brady</u> violation] rests with [Appellant].") (quoting <u>United States v. King</u>, 628 F.3d 693, 701-02 (4th Cir. 2011)); <u>Juniper v. Zook</u>, 876 F.3d 551, 564 (4th Cir. 2017) ("To prevail on his <u>Brady</u> claim: (1) '[t]he evidence at issue [is] favorable to [Petitioner], either because it is exculpatory, or because it is impeaching;' (2) 'that evidence [was] suppressed by the State, either willfully or inadvertently;' and (3) 'prejudice [] ensued.'" (quoting <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004)); <u>Vinson v. True</u>, 436 F.3d 412, 420 (4th Cir. 2005) ("To succeed on a <u>Brady</u> claim, the accused must prove that the evidence suppressed is favorable to him, either because it is exculpatory or because it has some impeaching value; that the prosecution suppressed the evidence; and that prejudice resulted from the suppression." (citing <u>Strickler</u>, 527 U.S. at 281-82); <u>Maynard v. Dixon</u>, 943 F.2d 407, 417 (4th Cir. 1991) ("The Court also made clear that t*he defendant has the burden of demonstrating* that the State withheld favorable evidence and that the evidence raises a reasonable probability that defendant would have obtained a different result had he use of the evidence.") (emphasis added).

## VII. Conclusion

For the foregoing reasons, the motion to dismiss the petition [Dkt. No. 11] must be granted and the petition must be dismissed with prejudice and an appropriate Order shall issue.[24]

Entered this 22nd day of February 2022.

Alexandria, Virginia

_____
Anthony J. Trenga
United States District Judge

---

[24] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.